OMAHA TRIBE OF NEBRASKA,
Plaintiff,

v.

Thomas J. MILLER, Defendant.

No. 4:03–CV–40400.

United States District Court,
S.D. Iowa,
Central Division.

Feb. 27, 2004.

Chip J. Lowe, Howe Cunningham & Lowe PLC, Urbandale, IA, Michael J. Leahy, Lyman L. Larsen, Stinson Morrison Hecker LLP, Omaha, NE, Allison F. Eklund, Henry M. Buffalo, Jr., Jacobson Buffalo Law Firm, Saint Paul, MN, for Plaintiff.

Donald D. Stanley, Jr., Attorney General of Iowa, Des Moines, IA, for Defendant.

## ORDER ON MOTION TO DISMISS

GRITZNER, District Judge.

This matter comes before the Court on Defendant's Motion to Dismiss. The matter was submitted on the briefs and the transcript of a hearing held before Hon. Joseph Bataillon in the United States District Court for the District of Nebraska.[1]

### I. Summary of Material Facts and Procedure

Iowa, along with several other states, sued several tobacco manufacturers and tobacco trade organizations in the mid–1990s. The states and the tobacco companies eventually settled these suits, creating a Master Settlement Agreement ("MSA"). The MSA, dated November 23, 1998, is between the major tobacco product manufacturers (the "Participating Manufacturers" or "PMs") and forty-six states,[2] the District of Columbia, Puerto Rico, and four other U.S. territories. Each settling state approved of the settlement, entering a Consent Decree and Final Judgment consistent with the MSA.

In addition to placing restrictions upon the advertising and marketing of tobacco products, the MSA also provided that the PMs would agree to make cash payments to the settling states in perpetuity. These cash payments are intended in part to compensate for state expenditures for tobacco-related public health measures and to reimburse states for the health care costs they incur as providers of last resort for any of their citizens who may suffer from smoking-related illnesses. In exchange for these cash payments, the settling states agreed to release specified past and future tobacco-related claims against the PMs (but not claims of individual smokers).

Various tobacco companies (known as "Non–Participating Manufacturers" or "NPMs") have declined to participate in the MSA. NPMs have no obligations under the MSA; the public health provisions and financial obligations imposed by the MSA do not apply to NPMs. The settling states therefore expressly preserved in the MSA all of their past and future claims against NPMs.

The settling states became concerned that the NPMs could escape future liability to the states through financial management that would render them judgment proof or otherwise unable to satisfy future judgments if called upon to pay damages for harm caused by their tobacco products. The settling states were also concerned that since NPMs were not required to make cash payments to the states, as were PMs, NPMs could expand their markets and unfairly compete with PMs due to their lower costs and commercial freedom. "Escrow" or "qualifying" statutes were passed by the states in response to these concerns.

Iowa's escrow statute is codified in Iowa Code § 453C.2. The statute provides as follows:

Any tobacco product manufacturer selling cigarettes to consumers within the state, whether directly or through a distributor, retailer, or similar intermedi-

---

1. The procedural background of this case, which was transferred to this Court from the District of Nebraska, is discussed below.

2. The State of Iowa participated in the MSA.

ary or intermediaries, on or after May 20, 1999, shall do one of the following:

1. Become a participating manufacturer as that term is defined in section II(jj) of the master settlement agreement and generally perform its financial obligations under the master settlement agreement.

2.a. Place into a qualified escrow fund by April 15 of the year following the year in question, the following amounts, as such amounts are adjusted for inflation: (1) For 1999: $.0094241 per unit sold on or after May 20, 1999.(2) For 2000: $.0104712 per unit sold .(3) For each of 2001 and 2002: $.0136125 per unit sold. (4) For each of 2003 through 2006: $.0167539 per unit sold. (5) For 2007 and each year thereafter: $.0188482 per unit sold.

Iowa Code § 453C.2. Thus, in short, the statute requires NPMs to either participate in the MSA or deposit into an escrow account a cash amount based on tobacco product sales to Iowa consumers. Under the statute, the annual deposits are to be held in escrow by the State; after 25 years, any funds that have not been released from escrow shall be returned to the NPM. Iowa Code § 453C.2(2)(b)(3). The NPM will receive the interest on the funds it places into its escrow account. Iowa Code § 453C.2(2)(b) ("A tobacco product manufacturer that places funds into escrow pursuant to paragraph 'a' shall receive the interest or other appreciation on such funds as earned.").

▉ Plaintiff Omaha Tribe of Nebraska is a federally recognized Indian Tribe located in northeastern Nebraska and a small portion of western Iowa. Omaha Nation Enterprises, Inc. ("ONE"), is an economic enterprise that was incorporated by the Omaha Tribe Tribal Council on December 3, 1993.[3] In 1997, ONE began operating a cigarette manufacturing company under the trade name Omaha Nation Tobacco Company ("Omaha Nation"). Defendant asserts that Omaha Nation manufactures and sells cigarettes in the state of Iowa; however, Plaintiff disputes this presumption, demanding documentation to show past and present sales in the state. Whether Omaha Nation has sold cigarettes in the state of Iowa or not, it is clear that Omaha Nation has not become a participating manufacturer or placed the mandatory amounts into an escrow account.

In early 2002, Iowa, through its Attorney General, Thomas Miller, filed suit in Polk County District Court seeking to enforce Iowa's escrow statute against Omaha Tribe, ONE, ONE's corporate officers and licensed distributors, and various individual tribal council members. The state court petition seeks declaratory and injunctive relief against all defendants and an order requiring ONE to place funds in an escrow account and pay civil penalties consistent with Iowa law.[4]

---

3. On May 6, 2002, Defendants moved for judicial notice of certain public documents, including the Constitution and Bylaws of the Omaha Tribe of Nebraska, the Corporate Charter of the Omaha Tribe of Nebraska, the Omaha Tribe of Nebraska Business Corporation Ordinance, Articles of Incorporation of Omaha Nation Enterprises, Inc., and the Bylaws of Omaha Nation Enterprises, Inc. Plaintiff had no objection to the Court taking judicial notice of these documents. On February 24, 2003, Judge Bataillon granted Defendants' request for judicial notice. "The dis-

trict court may take judicial notice of public records and may thus consider them on a motion to dismiss." *Stahl v. U.S. Dept. of Agriculture,* 327 F.3d 697, 700 (8th Cir.2003).

4. The Tribe filed an answer to the state court complaint on March 25, 2002. On May 17, 2002, hearing was held on the Tribe's motion to stay the state court proceedings. The state court denied the motion to stay because no dispositive motion was pending before that court.

On March 14, 2002, Plaintiff Omaha Tribe filed a complaint in the U.S. District Court for Nebraska, asserting that the Attorneys General of South Dakota, Missouri, and Iowa exceeded their authority by imposing each state's relative tobacco escrow statute on the Tribe, a federally recognized sovereign Indian tribe that Plaintiff alleges is immune from taxation and regulation by the states as a matter of law. In its complaint, Plaintiff requested the Court to declare the tobacco escrow statutes unconstitutional or otherwise ultra vires as applied to the Tribe, issue a preliminary injunction to stay the pending state court proceedings, and issue a permanent injunction to enjoin Defendants from imposing the escrow statutes against the Tribe. Plaintiff also requests an award of attorney's fees and costs incurred in bringing this action under 42 U.S.C. § 1988.[5]

On May 3, 2002, the Defendants moved to dismiss Plaintiff's complaint pursuant to Fed.R.Civ.P. 12(b)(6) for failure to state a claim upon which relief can be granted. In the motion, Defendants asserted that the statutes at issue, as well as the enforcement actions brought by each Defendant in his official capacity, do not violate the Commerce or Supremacy Clauses of the United States Constitution and were not preempted or barred by any act of Congress or by any principle of Indian law recognized by the United States Supreme Court. On May 9, 2002, the Defendants moved to dismiss pursuant to Fed.R.Civ.P. 12(b)(2) and 12(b)(3) for lack of personal jurisdiction and improper venue. Hearing was held on November 21, 2002, before the Honorable Joseph Bataillon. On February 24, 2003, Judge Bataillon denied Defen-

dants' 12(b)(6) motion to dismiss as moot and granted Defendants' motion to dismiss based on lack of personal jurisdiction and improper venue.

On March 6, 2003, Plaintiff moved for transfer of venue to the Southern District of Iowa as to Defendant Thomas Miller only and stipulated to the dismissal without prejudice as to the remaining Attorneys General. On April 1, 2003, an order was entered transferring the case to the Southern District of Iowa as to Defendant Thomas Miller; the case was dismissed without prejudice as to all remaining defendants. The Court further ordered that the Fed.R.Civ.P. 12(b)(6) motion to dismiss for failure to state a claim, which had previously been denied by the Court, be vacated as to Defendant Thomas Miller, and such motion was to be deemed currently pending, to be adjudicated by the United States District Court for the Southern District of Iowa.[6]

## II. Standard of Review

"A motion to dismiss should not be granted unless the plaintiff can prove no set of facts entitling him to relief." *Kottschade v. City of Rochester,* 319 F.3d 1038, 1040 (8th Cir.2003). The Court must accept as true all of the Tribe's factual allegations and view them in the light most favorable to the Tribe when analyzing the adequacy of the complaint's allegations under Fed.R.Civ.P. 12(b)(6). *Schaller Telephone Co. v. Golden Sky Systems, Inc.,* 298 F.3d 736, 740 (8th Cir.2002). The complaint must reveal an insuperable bar to relief on its face to warrant a Rule 12(b)(6) dismissal. *Id.* (citing *United States v. Aceto Agric. Chem. Corp.,* 872 F.2d 1373, 1376 (8th Cir.1989)).

---

**5.** Plaintiff filed an amended complaint on May 21, 2002.

**6.** This Court considered the November 21, 2002, oral argument presented to Judge Ba-

taillon; in addition, during a telephone status conference held on August 3, 2003, counsel agreed that the matter was fully submitted to the Court for review. Therefore, no further hearing was required before this Court.

"[A] complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). In construing the facts, the Court shall "reject conclusory allegations of law and unwarranted inferences." *Silver v. H & R Block, Inc.,* 105 F.3d 394, 397 (8th Cir.1997). If a motion to dismiss is pursuant to Federal Rule of Civil Procedure 12(b)(6), the Court must only consider the pleadings in determining whether the Plaintiff has stated a claim upon which relief may be granted. Fed. R.Civ.P. 12(b)(6).

### III. Applicable Law and Discussion

In Count I of the amended complaint, Plaintiff alleges that Defendant has unlawfully imposed and attempted to enforce Iowa's escrow statute against the Tribe in violation of Article I, Section 8 of the United States Constitution, which reserves the power to regulate commerce with Indian tribes exclusively to the federal government. U.S. Const. art. 1 § 8, cl.3. Plaintiff asserts it is entitled to declaratory relief pursuant to 28 U.S.C. § 2201 (2000) and injunctive relief pursuant to 42 U.S.C. § 1983 (2000) and 28 U.S.C. § 1651 (2000).

■ Although the parties refer to Commerce Clause doctrine, "the fact that States and tribes have concurrent jurisdiction over the same territory makes it inappropriate to apply Commerce Clause doctrine developed in the context of commerce 'among' States with mutually exclusive territorial jurisdiction to trade 'with' Indian tribes." *Cotton Petroleum Corp. v. New Mexico,* 490 U.S. 163, 192, 109 S.Ct. 1698, 104 L.Ed.2d 209 (1989) (noting that the Commerce Clause draws a clear distinction between "Indian Tribes" and "States").[7] The appropriate analysis begins with the Indian Commerce Clause.

■ The Indian Commerce Clause states, "The Congress shall have Power ... [t]o regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes". U.S. Const. art. I, § 8, cl. 3.

This congressional authority and the "semi-independent position" of Indian tribes have given rise to two independent but related barriers to the assertion of state regulatory authority over tribal reservations and members. First, the exercise of such authority may be pre-empted by federal law. Second, it may unlawfully infringe on the right of reservation Indians to make their own laws and be ruled by them.

*White Mountain Apache Tribe v. Bracker,* 448 U.S. 136, 143, 100 S.Ct. 2578, 65 L.Ed.2d 665 (1980) (citations and quotations omitted).

The two barriers are independent because either, standing alone, can be a sufficient basis for holding state law inapplicable to activity undertaken on the reservation or by tribal members. They are related, however, in two important ways. The right of tribal self-government is ultimately dependent on and subject to the broad power of Congress. Even so, traditional notions of Indian

---

**7.** It is "well established that the Interstate Commerce and Indian Commerce Clauses have very different applications. In particular, while the Interstate Commerce Clause is concerned with maintaining free trade among the States even in the absence of implementing federal legislation, *see McLeod v. J.E. Dilworth Co.,* 322 U.S. 327, 330, 64 S.Ct. 1023, 1025, 88 L.Ed. 1304 (1944); *Pike v. Bruce Church, Inc.,* 397 U.S. 137, 90 S.Ct. 844, 25 L.Ed.2d 174 (1970), the central function of the Indian Commerce Clause is to provide Congress with plenary power to legislate in the field of Indian affairs." *Cotton Petroleum Corp.,* 490 U.S. at 192, 109 S.Ct. 1698.

self-government are so deeply engrained in our jurisprudence that they have provided an important "backdrop" against which vague or ambiguous federal enactments must always be measured.

*Id.* (citation omitted); *see also Marty Indian Sch. Bd., Inc. v. South Dakota,* 824 F.2d 684, 686 (8th Cir.1987). "Federal statutes and regulations thus must be generously construed in order to comport with the strong tradition and national policy of promoting tribal self-sufficiency." *Id.* (citing *White Mountain,* 448 U.S. at 143–44, 100 S.Ct. 2578).

■ Courts must apply standards different than those employed in other areas of federal preemption when deciding whether federal law preempts state authority to regulate tribal activities. *Cabazon Band of Mission Indians v. Wilson,* 37 F.3d 430, 433 (9th Cir.1994). "State jurisdiction is preempted by the operation of federal law if it interferes or is incompatible with federal and tribal interests reflected in federal law, unless the State interests at stake are sufficient to justify the assertion of State authority." *New Mexico v. Mescalero Apache Tribe,* 462 U.S. 324, 334, 103 S.Ct. 2378, 76 L.Ed.2d 611 (1983) (finding the application of New Mexico's hunting and fishing laws would interfere with the comprehensive tribal regulatory scheme; the tribe had engaged in a massive undertaking seeking to manage the reservation's wildlife and land resources specifically for the benefit of tribe members, and there were no state interests to justify the assertion of concurrent authority).

■ Plaintiff argues that Iowa Code § 453C.2 is preempted in part because of the "dormant" or negative aspects of the Indian Commerce Clause and also due to the unique relationship between Indian tribes and the federal government. While Plaintiff asserts that the Indian Commerce Clause is itself an indication of the federal government's exclusive plenary power over Indian tribes, the Indian Commerce Clause in and of itself does not provide an automatic exemption for Indian tribes. *Confederated Tribes of Siletz Indians of Oregon v. Oregon,* 143 F.3d 481, 486 (9th Cir.1998) ("Indian tribes do not have an automatic exemption from state law.") (citing *White Mountain,* 448 U.S. at 144, 100 S.Ct. 2578); *Washington v. Confederated Tribes of Colville Indian Reservation,* 447 U.S. 134, 148, 100 S.Ct. 2069, 65 L.Ed.2d 10 (1980)(recognizing *Moe v. Confederated Salish and Kootenai Tribes of Flathead Reservation,* 425 U.S. 463, 481 n. 17, 96 S.Ct. 1634, 48 L.Ed.2d 96 (1976) rejected "the stark and rather unhelpful notion" that the Commerce Clause provides an automatic exemption to Indian tribes as a matter of constitutional law).

■ In addition to relying on the Indian Commerce Clause as a basis for federal preemption of Iowa Code § 453C.2, Plaintiff cites to numerous federal acts in support of the proposition that there exists a congressional intent to support and encourage Indian tribal self-determination and economic self-sufficiency.[8]

The Indian Reorganization Act of 1934, 48 Stat. 984, 25 U.S.C. § 461 et seq., the Indian Financing Act of 1974, 88 Stat. 77, 25 U.S.C. § 1451 et seq., and the Indian Self–Determination and Education Assistance Act of 1975, 88 Stat. 2203, 25 U.S.C. § 450 et seq., evidence to varying degrees a congressional concern with fostering tribal self-government and economic development, but

**8.** *See* Indian Financing Act of 1974 §§ 2–503, 25 U.S.C. §§ 1451–1453; Indian Reorganization Act section 1 et seq., 25 U.S.C. section 461 et seq.; Act of March 29, 1928, 45 Stat. 1716, Indian Self–Determination and Education Assistance Act, 88 Stat. 2203 (1975); 25 U.S.C. et seq.

none goes so far as to grant tribal enterprises selling goods to nonmembers an artificial competitive advantage over all other businesses in a State. *Confederated Tribes of Colville Indian Reservation*, 447 U.S. at 155, 100 S.Ct. 2069. While these statutes clearly exhibit a firm federal policy of promoting tribal self-sufficiency and economic development, *see White Mountain*, 448 U.S. at 143–44, 100 S.Ct. 2578, they do not contain provisions which explicitly or implicitly preempt Iowa's escrow statute.

In addition, there exists no federal law regulating tobacco which explicitly preempts the imposition of the escrow statute at issue and tobacco is not implicitly preempted by federal law. Congress has repeatedly refused to regulate the entire field of tobacco, opting instead to create a distinct regulatory scheme focusing mainly on the labeling and advertising of tobacco products. *See Food and Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 137, 120 S.Ct. 1291, 146 L.Ed.2d 121 (2000) (holding the FDA lacks authority to regulate tobacco products).

Congress has enacted six separate statutes since 1965 which address the problem of tobacco use and human health. *Id.* at 137–38, 120 S.Ct. 1291; *see* Federal Cigarette Labeling and Advertising Act (FCLAA), 15 U.S.C. §§ 1331–1340 (2003) (requiring that health warnings appear on all packaging and in all print and outdoor advertisements); Public Health Cigarette Smoking Act of 1969, 15 U.S.C. § 1340 (2003) (stating packages of cigarettes manufactured, imported, or packaged for export from the United States or for delivery to a vessel or aircraft ... for consumption beyond the jurisdiction of the internal revenue laws of the United States shall be exempt from the federal cigarette labeling and advertising requirements); Alcohol and Drug Abuse Amendments of 1986, 42 U.S.C. §§ 290aa–1—290bb–23 (2003) (requiring the Secretary of Health and Human Services to report every three years to Congress on research findings concerning tobacco's addictive properties); Comprehensive Smoking Education Act, 15 U.S.C. § 1335a (2003) (Secretary of Health and Human Services shall establish and carry out a program to inform the public of any dangers to human health presented by cigarette smoking); Comprehensive Smokeless Tobacco Health Education Act of 1986, 15 U.S.C. §§ 4401–4408 (2003) (prohibiting the advertisement of tobacco products through any electronic communication medium regulated by the Federal Communications Commission); Alcohol, Drug Abuse, and Mental Health Administration Reorganization Act, 42 U.S.C. §§ 300x–21—300x–35 (2003) (making states' receipt of certain federal grants contingent upon their prohibiting any tobacco product manufacturer, retailer, or distributor from selling or distributing any tobacco product to individuals under the age of 18).

Congress' tobacco-specific legislation has created a specific regulatory schema for addressing the tobacco industry and problems relating to tobacco and health, but these federal statutes do not indicate a congressional intention to preempt the entire field of cigarette regulation. Further, this Court finds nothing in Iowa's escrow statute which conflicts with the federal regulatory scheme. The federal statutes pertaining to the regulation of tobacco therefore do not preempt Iowa's escrow statute. *See Grand River Enterprises Six Nations, Ltd. v. Pryor*, 2003 WL 22232974, \*17 (S.D.N.Y.2003) (FCLAA does not preempt escrow statutes because there is nothing in the escrow statutes having to do with advertising).

"State jurisdiction is preempted by the operation of federal law if it interferes

or is incompatible with federal and tribal interests reflected in federal law, unless the State interests at stake are sufficient to justify the assertion of State authority." *Mescalero Apache Tribe,* 462 U.S. at 334, 103 S.Ct. 2378; *see also Casino Resource Corp. v. Harrah's Entertainment, Inc.,* 243 F.3d 435, 437 (8th Cir.2001). Precedent clarifies that the federal interest in encouraging Indian tribal economic self-sufficiency and tribal self-determination alone is insufficient to preempt state jurisdiction to regulate off-reservation tribal commerce. An examination of the relevant law demonstrates that Iowa Code § 453C.2 does not interfere and is not incompatible with federal or tribal interests expressed in federal law.

■ In Count II of the amended complaint, Plaintiff alleges a violation of the Supremacy Clause. "Pursuant to the Supremacy Clause, the federal government has the power to preempt state and municipal authority in a particular field." *N.L.R.B. v. Pueblo of San Juan,* 276 F.3d 1186, 1191 (10th Cir.2002) (citing *Wardair Canada, Inc. v. Florida Dept. of Revenue,* 477 U.S. 1, 106 S.Ct. 2369, 91 L.Ed.2d 1 (1986)).

> Under the Supremacy Clause of the Constitution, whether a federal law preempts a state law generally turns on the answers to four questions. Is the state law explicitly preempted by the federal law? Is the state law implicitly preempted by the federal law because Congress has regulated the entire field? Is the state law implicitly preempted because compliance by a private party with federal and state law is impossible? Is the state law implicitly preempted because it creates an obstacle to accom-

plishment and execution of the full purpose of federal law?

*Sears, Roebuck and Co. v. O'Brien,* 178 F.3d 962, 966 (8th Cir.1999) (internal citations omitted). As previously discussed, Iowa's escrow statute is neither explicitly nor implicitly preempted by federal law, and Congress has refused to regulate the entire tobacco industry. There is no indication that compliance with federal law and Iowa's escrow statute would be incompatible. As there exists no conflict between Iowa's escrow statute and federal law, there is no basis for federal preemption of Iowa's escrow statute under the Supremacy Clause. Count II of the amended complaint, in which Plaintiff alleges a violation of the Supremacy Clause in Article VI, must therefore be dismissed.

■ This does not end the inquiry with regard to the Indian Commerce Clause stated in Count I of the amended complaint, as the Court must next examine the second barrier to the assertion of state regulatory authority over Indian tribes and determine whether Iowa Code § 453C unlawfully infringes on the right of reservation Indians to make their own laws and be ruled by them.[9]

Plaintiff argues that Defendant is impermissibly reaching across state lines to apply the escrow statute to the Tribe for its manufacture and sale of cigarettes on the reservation, citing to *California v. Cabazon Band of Mission Indians* for the proposition that states may not impose civil-regulatory laws on Indian tribes absent express congressional intent. *California v. Cabazon Band of Mission Indians,* 480 U.S. 202, 107 S.Ct. 1083, 94 L.Ed.2d 244 (1987). Plaintiff opts not to focus on an

---

**9.** Along with the self-government barrier imposed by the Indian Commerce Clause, Count IV of the amended complaint alleges Defendant has unlawfully imposed and attempted to enforce Iowa's escrow statute on the Tribe,

an action that the Tribe asserts is inconsistent with the Tribe's *per se* exemption from state taxation or regulation pursuant to the Tribe's sovereign right to make its own laws and be governed by them.

important distinction; *Cabazon* indicated that states may not impose civil regulatory laws on Indian tribes *on their reservations* absent express congressional intent. *Id.* at 207, 107 S.Ct. 1083 ("state laws may be applied to tribal Indians on their reservations if Congress has expressly so provided."). "Absent express federal law to the contrary, Indians going beyond reservation boundaries have generally been held subject to non-discriminatory state law otherwise applicable to all citizens of the State." *Mescalero Apache Tribe v. Jones,* 411 U.S. 145, 148–49, 93 S.Ct. 1267, 36 L.Ed.2d 114 (1973) (indicating that this principle applies as equally to a state's tax laws as it does to state criminal laws, and is as relevant to tribal ski resorts as it is to tribal fishing enterprises).

Plaintiff claims that Defendant *is* impermissibly reaching across state lines to apply the escrow statute to the Tribe for its manufacture and sale of cigarettes *on the reservation.* Yet, the language of the statute clearly limits its applicability only to the sale of cigarettes occurring within the state of Iowa, *cf. Tunica–Biloxi Tribe v. Louisiana,* 964 F.2d 1536, 1540 (1992) ("A tax on the sale of tangible property is not a tax on the property itself; rather, it is a tax on the sales transaction.") (citing *Sullivan v. United States,* 395 U.S. 169, 175, 89 S.Ct. 1648, 23 L.Ed.2d 182 (1969)), and Defendant concedes the escrow statute does not apply to on-reservation sales of ONE cigarettes to tribal members.

■ Iowa's escrow statute has no effect on the sale of cigarettes occurring outside of the state of Iowa and does not discriminate against Indian commerce. *See Star Scientific, Inc. v. Beales,* 278 F.3d 339, 356 (4th Cir.), *cert. denied,* 537 U.S. 818, 123 S.Ct. 93, 154 L.Ed.2d 24 (2002) (finding Virginia's tobacco escrow statute, which is identical to Iowa's, did not overtly discriminate against interstate commerce); *PTI, Inc. v. Philip Morris Inc.,* 100 F.Supp.2d 1179, 1201 (C.D.Cal.2000) (stating that the requirement of California's escrow statute, which is identical to Iowa's, "applies equally to in-state, out-of-state, and foreign tobacco product manufacturers; the statute makes no distinction based on cigarette origin."). "The [s]tatutes treat all cigarette manufacturers equally. Regardless of whether they are in-state or out-of-state manufacturers, all NPMs must satisfy the same requirements. As there is no preference to local commercial interest or unequal burden on out-of-state interests, there is no discrimination." *Grand River Enterprises,* 2003 WL 22232974, *11 (examining escrow statutes of 31 states and finding statutes would apply only to off-reservation sales, activities that could be freely regulated). "[T]he off-reservation activities of Indians are generally subject to the prescriptions of a 'nondiscriminatory state law' in the absence of 'express federal law to the contrary.'" *Mescalero Apache Tribe,* 462 U.S. at 336 n. 18, 103 S.Ct. 2378 (citing *Mescalero Apache Tribe,* 411 U.S. at 148–149, 93 S.Ct. 1267); *see also Oregon Dept. of Fish and Wildlife v. Klamath Indian Tribe,* 473 U.S. 753, 765 n. 16, 105 S.Ct. 3420, 87 L.Ed.2d 542 (1985).

At least one other court has had the opportunity to address how the Indian Commerce Clause affects the applicability of a state escrow statute. *See Grand River Enterprises,* 2003 WL 22232974, *12. The plaintiffs in that case were cigarette manufacturers, importers, and wholesalers; the defendants were 31 current or former state attorneys general. *Id.* at *1.

Plaintiffs also claim that the Statutes violate the Commerce Clause by regulating Grand River, a Canadian company located on tribal land in Ontario. The Indian Commerce Clause applies only to Native–American tribes recognized by the federal government and operating within the United States. Plaintiffs' ar-

gument appears to be that Grand River is covered by the Indian Commerce Clause because Grand River conducts business on Iroquois property in the United States. Even if this suggestion is accepted as true and sufficient for coverage, an NPMs escrow obligation arises solely from its sales of cigarettes occurring off-reservation. It is well-settled that a state can regulate (i) off-reservation transactions conducted by native Americans; (ii) on-reservation sales to persons other than Native Americans; and (iii) impose certain requirements upon Native Americans in regulating those sales. *Dept. of Taxation & Finance v. Attea,* 512 U.S. 61, 114 S.Ct. 2028, 129 L.Ed.2d 52 (1994); *Washington v. Confederated Tribes of Colville Indian Reservation,* 447 U.S. 134, 100 S.Ct. 2069, 65 L.Ed.2d 10 (1980). The requirements of the Statutes are entirely consistent with these principles. Thus, there is no violation of the Commerce Clause.

*Id.* at *12.

Iowa's escrow statute does not interfere with Plaintiff's sovereign right to self-government, and it does not discriminate against or place undue burdens on Indian commerce. Count IV of the amended complaint, in which Plaintiff alleges a violation of the Tribe's sovereign right to make its own laws and be governed by them, must therefore be dismissed. Because neither barrier to the assertion of state regulatory authority over tribal reservations and members is present, Count I of the amended complaint, in which Plaintiff alleges a violation of Art. I, Section 8 of the United States Constitution (the Indian Commerce Clause), must be dismissed.

Plaintiff asserts that even if Iowa Code § 453C.2 is found to be constitutional, the escrow funds created under the statute serve no legitimate state interest as applied to the Tribe because the Tribe has sovereign immunity from suit absent its consent and the state would therefore be unable to secure judgment against the Tribe entitling it to access the escrow funds as otherwise provided in the statute.[10] "It is undisputed that an Indian tribe enjoys sovereign immunity." *Hagen v. Sisseton–Wahpeton Community College,* 205 F.3d 1040, 1043 (8th Cir.2000) (citing *Kiowa Tribe of Oklahoma v. Manufacturing Technologies, Inc.,* 523 U.S. 751, 754, 118 S.Ct. 1700, 140 L.Ed.2d 981 (1998)). Indian tribes have been held repeatedly to enjoy immunity against suits by states. *See Blatchford v. Native Village of Noatak and Circle Village,* 501 U.S. 775, 775, 111 S.Ct. 2578, 115 L.Ed.2d 686 (1991) (citing *Oklahoma Tax Comm'n v. Citizen Band of Potawatomi Tribe of Okla.,* 498 U.S. 505, 509, 111 S.Ct. 905, 112 L.Ed.2d 1112 (1991)).

Escrow statutes were passed by the various states in response to two concerns. First, the settling states feared NPMs could escape future liability through financial management that would render NPMs judgment proof or otherwise unable to satisfy future judgments if called upon to pay damages for harm caused by their tobacco products. Second, the settling states were concerned that if NPMs were not required to make cash payments to the states like the PMs were, NPMs could expand their markets due to their lower costs and commercial freedom. Legislative intent expressed in regard to the South Dakota statute is illustrative:

---

**10.** Defendant asserts that the amended complaint does not raise any challenge to the state's personal jurisdiction over Plaintiff Tribe in the state lawsuit. Plaintiff is not asserting sovereign immunity in its complaint, rather, Plaintiff is pointing to its possession of sovereign immunity as a basis for finding that the escrow statute serves no legitimate state interest as applied to the Tribe.

It would be contrary to this policy of the State of South Dakota if tobacco product manufacturers who determine not to enter into [the MSA] could use a resulting cost advantage to derive large, short-term profits in the years before liability may arise without ensuring that the state will have an eventual source of recovery from them if they are proven to have acted culpably. It is thus in the interest of the state to require that such manufacturers establish a reserve fund to guarantee a source of compensation and to prevent such manufacturers from deriving large, short-term profits and then becoming judgment-proof before liability may arise.

S.D. Codified Laws § 10–50B–2 (2003) (legislative intent of South Dakota's escrow statute; South Dakota's escrow statute is identical to Iowa's); *see e.g.*, Ariz. Rev.Stat. § 44–7101 (2003) (same); W. Va. Code § 16–9B–1(f) (2003) (same); V.I.Code Ann. § 305(d)(a)(6) (same).

The language of Iowa Code § 453C.2 indicates the statute was intended to address both of those concerns. Funds paid into the escrow account "shall be released from escrow only under any of the following circumstances: (1)[t]o pay a judgment or settlement on any released claim brought against such tobacco product manufacturer by the state or any releasing party located or residing in the state." Iowa Code § 453C.2. This language clearly indicates the intent to ensure a source of payment is established for any future judgments obtained against the manufacturer.

(2) To the extent that a tobacco product manufacturer establishes that the amount the manufacturer was required to place into escrow in a particular year was greater than the state's allocable share of the total payments that such manufacturer would have been required to make in that year under the master settlement agreement had such manu-

facturer been a participating manufacturer, as such payments are determined pursuant to section IX(I)(2) of the master settlement agreement and before any of the adjustments or offsets described in section IX(I)(3) of that agreement other than the inflation adjustment, the excess shall be released from escrow and revert back to such tobacco product manufacturer.

Iowa Code § 453C.2. This provision evidences the second purpose behind the escrow statute. The escrow payments required under the statute are intended to eliminate the financial advantage of NPMs by forcing them to pay into an escrow account an amount that is intended to mimic the payment PMs are required to pay under the MSA. To the extent the escrow payment exceeds the amount that an NPM would have been required to pay had it participated in the MSA, any such overpayment would be released from the escrow account and returned to the manufacturer, as the payment is intended to limit an NPMs commercial advantage, not work as a penalty.

The State of Iowa can control cigarette manufacturing activities to the extent of sales in the state either through ultimate access to the escrow fund (upon a finding that no tribal sovereign immunity exists for this activity), or by denying the distribution of Omaha Nation's tobacco product in the state for failure of the manufacturer to participate in the escrow system. Alternatively, the Tribe could elect, as a business matter, to waive its sovereign immunity to the extent of the escrow payments in order to obtain the right to sell tobacco products in the state. Even in the absence of these alternatives, the statute still has the legitimate purpose of not allowing unfair business advantage to the Tribe for its off-reservation business activities and preventing the use of the Tribe as a conduit for a manufacturer that does not

828

enjoy immunity. The escrow statute serves two independent state interests.

█ Finally, Plaintiff claims the due process and commerce clause violations alleged under Article I, Section 8 of the Constitution cannot be adjudicated until the parties have exchanged discovery requests to determine the nature and extent of any alleged and continuing sales to consumers in the state. "To avoid dismissal, a complaint must allege facts sufficient to state a claim as a matter of law and not merely legal conclusions." *Young v. City of St. Charles, Mo.*, 244 F.3d 623, 627 (8th Cir.2001). Plaintiff has failed to assert any facts which would be sufficient to state a due process claim. Moreover, whether or not any Omaha brand cigarettes were sold in Iowa does not affect the conclusion that Iowa's escrow statute does not constitute a violation of the Indian Commerce Clause. If other proceedings demonstrate no sales have been or are being made in Iowa, the statute would not impact the Plaintiff.

### CONCLUSION

Plaintiff can prove no set of facts in support of its claim that Iowa's escrow statute is preempted by or in conflict with federal law which would entitle it to relief. Count II and Count III are therefore dismissed. It appears beyond doubt that Plaintiff can prove no set of facts in support of its claim that enforcement of the Iowa escrow statute violates its sovereign right to self-government, therefore Count I and Count IV are also dismissed. Count V of the amended complaint alleged violations only on behalf of the State Attorneys General of South Dakota and Missouri and are therefore moot and inapplicable to Defendant Miller in the present case.

Plaintiff has raised sovereign immunity only in attacking the validity of the escrow statute as applied to the Tribe. Because the statute was enacted in response to two underlying concerns, even assuming the Tribe is immune from civil judgments stemming from ONE's tobacco products, the second purpose of the statute, to eliminate commercial disparity between PMs and NPMs, is still served by the statute.

The Court finds no set of facts which would entitle the Plaintiff to relief. Accordingly, Plaintiff's complaint is **dismissed.**

**IT IS SO ORDERED.**